The Judges of the United States Court of Appeals for the Eighth Circuit. This court is now in session. All right, we have one case for argument this afternoon, so I think we will dispense with the calling of the calendar, and let's just proceed with the argument. First of all, counsel, to both of you, I want to extend the thanks of the court for rearranging your schedule and agreeing to participate this afternoon by videoconferencing. And with that, we will proceed and hear from the appellant, Ms. Meadhouse. Thank you, Your Honor. Mr. Meadhouse, excuse me. Not a problem, Your Honor. What I'd like to do is get straight to the three questions that are before you and really the first two are the core of the issue. The first is whether the district court applied the guideline 2J1.2b to without causation that Jackson demands, and whether the court's upward variance to the 96-month statutory maximum is substantially or substantively unreasonable under Garland v. Webster. I think the theme of this is pretty simple. The obstruction of transmission punish defendant caused in offense, not the government's ordinary obligation to investigate and approve a homicide and certainly not a defendant's decision to go to Toronto or maintain his innocence. As to the first point, as to the guideline, there has to be a concrete causal nexus. When you look at the guideline, it talks about substantial interference. And in Application Note 1, it's an unnecessary expenditure of substantial government or court resources. What about the fact that there was grouping here? Doesn't that render any error that might exist harmless in any event? Because in the end, with the grouping, you start with the higher of the two offenses, and even after the three-level enhancement, it's 18 for the other charge, 17 for this one. Correct, Your Honor. I would say, no, I don't think it's harmless. When you look at the guidelines, if there is a guideline failure going into this calculus, a enhancement that should not replace 3742F1, 18 U.S.C. 3742F1, indicates that we're required to remand if there's a misapplication of the enhancement. Do you have any questions? Well, I think it doesn't matter because whether it was 14 or 18, we'd still choose the 18. And once you choose the 18, whether it was 14 or 17, it doesn't matter because we'd still choose the 18. So in the end, the guideline calculation that it was ultimately arrived at is the correct number. Am I wrong on that? Because I've been wrong plenty of times. Fairly right, Your Honor. But I think on this one, I'm right. I think at the end of the day, you still have to have a correct guidelines calculation in order to proceed, whether there's gripping or not. And I understand the argument that we would take the higher one, but I do not believe that you can get to that point without correctly calculating the guidelines. And if you have a misapplied enhancement, then the guidelines are incorrect. It should be remanded. And the court may or may not do the same thing. But if you take away that enhancement, the court's ultimate decision in doing the calculus might get thrown off because you don't know if they'll go to the top of the guidelines again. So I think you have to go through that proper procedure to see if the court can justify what they're doing. But I think that kind of goes hand-in-hand with the next point. The court below took the defendant's silence and denials in its trial as a basis for the enhancement all the way up to 96 months. When it didn't focus on whether the defendant created an expenditure or not. It held it against Mr. Firethunder that he actually went to trial, rather than looking at what would have happened if he had admitted it. The FBI still would have investigated the case. Still would have done its research on the forensics. Still would have looked at paint jobs. As a defense attorney at trial, if the FBI had said, we don't have to do any of that, there's a confession, that would be a gift. I would love that to happen. But they don't. What happened here was the type of investigation that they do in a homicide investigation. I think when you also look at the fact that the guidelines are 37 to 46 months, and we jump all the way up to 96 months, the court relied on the seriousness of the offense and the lack of acceptance. The problem is, that's already in the guidelines. That's already been calculated in the guidelines. It looks at 18 U.S.C. 1112 for involuntary manslaughter. Did the court also indicate that they were looking at the fact that a person who was innocent was incarcerated for a period of time? That seems to me to be something different than just the ordinary acceptance of responsibility. It's really saying that by failing to accept the responsibility, an otherwise provably innocent person was allowed to sit incarcerated, deprived of their liberty interest for some period of time, which doesn't seem to me to be in the guideline calculation at all. Yeah, I think that would be misplaced, because you could also blame it on the FBI for not going after the right person in the first place and investigating it in a fashion that they would have found Mr. Fire Thunder as the focus. But I also think it goes towards the final argument in terms of the final verdict. We have a very intoxicated person who had self-interest to then say he wasn't doing it and point the finger at Mr. Fire Thunder. This scenario happens often, and I think that's why it's not addressed in the guidelines, because that is part of trial. Part of trial is to say, someone else did it. What are the kind of offenses? And so to hold that against Mr. Fire Thunder and say, well, somebody stayed in jail all this time, you can look at the investigation, you can look at the prosecution, you can look at any different factors why that happened. But it's also common in defense work that somebody else gets blamed and then all of a sudden it turns. But we don't, as a matter of the guidelines, say these malappointments are added for that situation. And I think that's instructive. The lack of a guideline for that indicates that Congress and the Sentencing Commission did not intend for more time to be added when that situation arises. I will finish with this. Counsel, let me ask you this question on your guideline point, procedural error point. In page 43 of the sentencing transcript, the district courts stated that the reason I think that an 8-year sentence is appropriate is the fact that you took a woman's life, covered it up, hid your role, lied about your role, accepted no responsibility at that time or now. Would that statement as to why the court reached that sentence, does that not indicate that any procedural error that you're talking about would be harmless? No, Your Honor, because I think what the statement indicates is that the court held it against Mr. Feather Thunder for serving his innocence and going forward with trial. I think that is a misplaced statement that kind of strikes at the heart of this appeal. That the circumstances, the loss of life, were all considered in the guidelines for a crime that says without due caution or introspection, in the act of 8-1, in the Commission of Wealth Act. It's a tragedy that the guidelines account for that. But to say, you know, you could have confessed, you could have come forward, you could have removed the family out of this pressure. Your Honor, that's not in the guidelines to assert that. And certainly not a reason to go to the very top of the guidelines when you look at Mr. Feather Thunder's life and there were mitigating aspects such as alcoholism, poor childhood, low education. And no consideration of those mitigating factors in saying, why are we going to go from, you know, the top of the guidelines of 36 months all the way to 96? But I reserve what I can. All right, I'll allow you some time. We've asked a few questions. I'll allow you some time. We'll hear from the appellate. Thank you. Good afternoon. May it please the Court. My name is Megan Popham. I'm from the District of South Dakota and my office is in Rapid City. I joined today last year in the Court to affirm the lower court's findings. The first issue is that the District Court did not err in finding that the defendant fired Thunder substantially in feud with the Administration of Justice in this case. Two, did allow the record that the court had. The District Court did not err and did not impose a substantively unreasonable sentence. And then finally, the evidence was sufficient to find that Fire Thunder was guilty of all the offenses. The District Court didn't abuse its discretion in imposing the sentencing enhancement in this case because three levels was appropriate based on Fire Thunder's conduct. Abrogation Note 1 is assistful in that it provides that this enhancement can be provided if there is a premature or improper termination in investigation or when unnecessary expenditures or substantial governmental or court resources were utilized. And in this case, it's the unnecessary expenditure of substantial governmental resources. In Fire Thunder's brief, he argues that the gap in time indicates that everything that was done in this case was to prove Fire Thunder guilty of the offenses. And that's not correct. Before the District Court was the record, Fire Thunder's initial interview was in March of 2023. And that was Fire Thunder's initial involvement in crime where he denied being the one that pulled the trigger, denied involvement essentially at the crime. That audio interview as well as the transcript was provided to the jury in this case. The jury then had subsequent denials by Fire Thunder that occurred in October of 2023 that ultimately led to his first false statement conviction. And then Fire Thunder's additional false statement in May of 2024 that the jury convicted him of. Now, if that is correct, there must be a causal link. And that causal link is established by Fire Thunder's denials in this case. Fire Thunder does have the right to remain silent and he wasn't penalized for that. But he lied. And his lies compounded, thwarted the investigation, took it on a path that ultimately led to the wrong man being incarcerated and Fire Thunder free until 20 months later when he was charged for the offenses. So the causal link is established by Fire Thunder's false statements and the seriousness of his false statements to law enforcement. When confronted with the information that Bradford's defense attorney provided, in addition to the information that the special agent was already going over, this is what prompted additional interviews to take place. And that occurred in October of 2023 with Marino Waters. And unlike Fire Thunder when Marino Waters is interviewed the second time, Marino tells law enforcement that Clayton had the firearm. So law enforcement then goes back to Fire Thunder in October of 2023. And Clayton and Fire Thunder denies having a firearm that day. They went to the shooting. Now, there is a question. Go ahead. I'm sorry. I'm sorry. Time goes really fast in attending an argument. So I don't have the questions on the sentencing enhancement or the sentence itself. But I would like to discuss the sufficiency of evidence issued on appeal if I could. I find that the government's brief is somewhat vague and cursory on what evidence supports the element of gross negligence for purposes of involuntary manslaughter. For example, in summary of argument simply states, evidence presented at trial was sufficient to establish that Fire Thunder mishandled the firearm and caused it to discharge. Well, it sounds a lot like ordinary negligence to me. So what evidence was presented to support the finding that Fire Thunder acted with wanton or reckless disregard for life, that he reacted with knowledge that his conduct was a threat to the lives of others? There was in Fire Thunder's initial interview in March of 2023 that was played for the jury, Fire Thunder indicated at the end of that interview that he wasn't just going to stand there and wait while Bradford was getting busy with his girlfriend. So Fire Thunder knew or had reason to know that Bradford was inside the residence presumably having sexual intercourse with Quick Bear. Now the other wanton and reckless part would be relying upon a man, Marina Waters, who had consumed half a gallon of vodka that evening, and relied on Marina Waters to clear a gun in light of the testimony of Marina Waters that he had consumed a half a gallon of vodka. Doesn't that evidence indicate that he thought the gun was cleared rather than that he intentionally fired into an occupied gun? I believe the testimony of Marina Waters after some back and forth was that he could not state without a doubt that he had cleared the gun. He was not quite sure. But wouldn't you have to prove that he had knowledge that his conduct was a threat to the lives of others? If he had wanted the gun to be cleared, wouldn't that actually go the other direction? He relied on a drunk person to establish that the gun was cleared. Would that not have been negligent? Does that show that he was acting with disregard for the lives of others? Well then Clayton and Fire Thunder also had a hand injury from an explosion of a firework, and Clayton was also intoxicated according to Marina Waters. And so for whatever reason, whatever purpose, if Fire Thunder was at Bradford's residence, and he's pounding on the door with a firearm, or he's pointing it at, and a result of him being extremely intoxicated, relying on someone else who's intoxicated, and then mishandling the gun, that's wanton and that's gross negligence, especially compounded by the fact that he knew that that residence had been occupied by someone from hearing them, presumably engaging in sexual intercourse. When you say mishandling, what do you mean by that? What specific evidence was there as to mishandling? We've seen Fire Thunder testify, that's Clayton's mother, and she testified that Fire Thunder had a firecracker blow up in his hand, and so he couldn't quite use his hand as well as he used to be able to pre-injury, and so there was that testimony that he had that injury to his hand, and he relied upon Marina to be able to do those sorts of things for him, because he couldn't clear a gun with both hands. What I'm hearing you say is that it's gross negligence, and if you want to think about what gross negligence is conduct, it's what Judge Ross has been repeating over and over again, it is conduct that's wanton or reckless disregard for human life, right? That's a test. And what I'm hearing are the facts that point to this, that are such that any rational jury could have found this, that it's gross negligence, right? And so you'd be looking at, well, the gun was unloaded by a guy who was drinking and had been drunk for a long time. Two, that they knew somebody was in the house. Three, that Fire Thunder never bothered to check the gun, and so he didn't know whether it was loaded or not loaded. Four, that he had an injured hand, and his injury to his hand was such that he shouldn't have been handling any gun, because he could accidentally discharge. That's it. Those are the, that's what you got. That's all the evidence, essentially, yes. And so that is gross negligence, it's not just ordinary negligence? Yes. Yes, gross negligence, and that's what the jury found. Yeah, and my question is, is that in order to be gross negligence, it's got to be something that demonstrates a wanton disregard for the value of human life. And the question is, where does that wantonness or willful disregard of human life, where does it come into play in those facts? And I think that's through Clay Fire Thunder's own statement that he heard them getting busy, that he either knocked or tapped on the side of the sighting, and then based on his intoxicated state, mishandling the firearm, it went off. It would be different, it would never be appropriate to point a loaded firearm at someone's residence and then pull the trigger, and in this case, under all the circumstances, he shouldn't have been holding a firearm when he was intoxicated because of the likelihood that it is a dangerous weapon and that it could kill someone if mishandled inappropriately. I just wanted to address one other point that Judge Erickson had stated about the harmlessness of the sentencing enhancement, and the court is 100% correct on that, is because of grouping, it's really a harmless area analysis, and that's found at R document 115 paragraph 72, where the court did not apply the enhancement to the involuntary manslaughter, but because it was a higher offense level, the court went with that, and so any area would be harmless. Thank you for your time. I'll ask the court to affirm the lower court's findings. Thank you. Counsel, I have a follow-up question on the alleged procedural error, and that is this. If we have a situation where the defendant exercised his constitutional right to remain silent, you could not, in good faith, seek this enhancement, could you? Right. We couldn't do that, but in this case the defendant lied, and his lies are what continued the investigation, prompted the further investigation. The numerous experts have testified. That's my question. Was it the fact that he lied, or the fact that he didn't admit? If he would have admitted just being there, or having a firearm, I think it would be a different case, but the fact that he lied about having a firearm, made it an intentional lie, made it a false statement, but then prompted further investigation. Even though the government investigators would have to do the same work, investigative work, if he had remained silent? Not necessarily. I know that's what the agent testified at sentencing, but based on the false statement that Clayton Feirenthender made, in order to disprove or prove Feirenthender guilty of those offenses, all he would have had to have put on was a testimony with Melinda Waters indicating that Feirenthender did have a gun, but everything else was a result of the false, the falsity, proving his falsity was wrong. We did the investigation that was required. If I can start with the sufficiency, Your Honor. Hold on a second. Take a minute. Do counsel have less than 20 seconds left? Yes. Okay. Take a minute and respond. Okay. So as far as sufficiency, Your Honor, what we do have is an unclear, as you have stated, an unclear indication of gross negligence. And in some ways, the use of the hand or the inability to cuts both ways. Somebody who cannot handle a gun, whose fingers aren't able to handle a gun, that can imply innocence as much as it would apply what the government indicated. The other thing is there's lack of corroborated proof to go along with what Melinda Waters testified to, who was admittedly highly intoxicated at the time, and his accounts have been shifting back and forth with the incentive of testifying. So I think the panel is correct to look at that sufficiency of evidence and question the validity of the jury finding. As to an additional investigation, what we have is no specifics of what was actually added to this. So they had to do more because, and as the court indicated below, they also indicated the lack of honesty of coming forth right, hence the silence, was part of this decision, which I think we can agree that would not be proper in this case. So when you add to that that there are no specifics, what was added? When you add the agent's own testimony saying nothing was added, then we have a problem when we talk about adding the enhancement, but also in going to the very top of the guidelines. When we question the sufficiency of the evidence, and we have a deep question on whether this was wanton or disregard, even if you come to a jury finding of guilt, the lack of solid evidence to say this is wanton or gross negligence, disregard for life, goes against the court's findings that this has to go all the way up 50 months to the top of the guidelines. And because at the end of the day it's questionable if we can question the sufficiency of the evidence to the jury finding, when we certainly can question the finding that 96 months was appropriate because of wanton disregard. If it's not there for the jury finding, it's really not there for a sentencing. Thank you counsel for your argument. It's been well argued and it is presented, and we will render a decision in due course.